

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> MARIA A. MARTINEZ, M.D.; ) <br> ) <br> **and** ) <br> ) <br> COMMONWEALTH OF VIRGINIA, ) <br> *ex rel.* MARIA A. MARTINEZ, M.D.; ) <br> ) <br> Relator-Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> VIRGINIA UROLOGY CENTER. P.C., ) <br> ) <br> Defendant ) <br> ) <br> ) <br> _____ ) | Civil Action No. 3:09CV442 (REP) <br><br> *Filed In Camera and Under Seal* <br> *as required by 31 U.S.C. § 3730(b)(2)* <br> *and Virginia Code § 8.01-216.5* <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Relator-Plaintiff Maria A. Martinez, M.D. ("Relator-Plaintiff" or "Dr. Martinez") states

as follows for her Complaint:

### I.
### NATURE OF THE CASE

1.       This is an action to recover damages and civil penalties on behalf of the United

States of America and on behalf of the Commonwealth of Virginia arising out of false claims

that were knowingly presented by Defendant Virginia Urology Center, P.C. ("Defendant" or

"Virginia Urology") to the Medicare and Medicaid Programs pursuant to the Social Security Act,

42 U.S.C. §§ 1832(a)(2)(F)(i), 1833(i)(1)(A), 1833(i)(2)(A), (D) and 1833(a)(1)(G) and 42

U.S.C. § 1396b, and to recover damages resulting from Defendant's retaliatory discharge of

Relator-Plaintiff's employment for opposing such practices.  Relator-Plaintiff further asserts common law claims for wrongful discharge of employment in violation of public policy and for breach of contract related to her discharge.

2.     This action arises under the provisions of 31 U.S.C. § 327, *et seq.*, commonly known as the False Claims Act ("the federal Act") and Virginia Code § 8.01-216.1 *et seq.*, the Virginia Fraud Against Taxpayers Act ("state Act").

3.     The false claims complained of herein arose from the regulations implementing Section 1832(a)(2)(F)(i) of the Social Security Act, codified at 42 U.S.C. §1395k (that portion of the Social Security Act providing for Part B coverage of facility services furnished in connection with surgical procedures under the "Medicare Program") and./or Section 1887(a)(1) of the Social Security Act, codified at 42 U.S.C. §1395xx, Medicare Program: Payment for Physician Services Furnished in Hospitals, Skilled Nursing Facilities and Comprehensive Outpatient Rehabilitation Facilities, 48 Fed. Reg. 8,902, 8,907 (March 2, 1983).

4.     Defendant knowingly made, or condoned to be made on its behalf, fraudulent claims for the purpose of obtaining payment of monies by the Medicare Program, as set forth below.

5.  Relator-Plaintiff submits that Defendant's total liability for the practices enumerated herein exceeds Five Hundred Thousand Dollars ($500,000.00).

## II.
## JURISDICTION AND VENUE

6.     The United States District Courts have exclusive jurisdiction over actions brought under the federal Act pursuant to 31 U.S.C. § 3732, and otherwise have jurisdiction under 28

U.S.C. §§ 1331 and 1345.  This Court may exercise supplemental jurisdiction over related state claims pursuant to 28 U.S.C. § 1367(a).

7.      Section 3732(a) of the federal Act provides that "any action under Section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one defendant can be found, resides, transact business, or in which any act proscribed by Section 3729 occurred."  The acts complained of herein occurred in Richmond, Virginia and other places within this judicial district.

8.      Pursuant to the federal Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days, and shall not be served on Defendant until the Court so orders.  The United States may elect to intervene and proceed with the action within sixty (60) days, or longer if so ordered by the Court, after it receives the Complaint and Disclosure of Evidence.

9.      Under the state Act, the portions of this Complaint asserting state claims is to be filed *in camera* and remain under seal for a period of at least one hundred twenty (120) days, and shall not be served on Defendant until the Court so orders.  The Commonwealth of Virginia may elect to intervene and proceed with the action within one hundred twenty (120) days, or longer if so ordered by the Court, after it receives the Complaint and Disclosure of Evidence.

## III.
## DEFENDANT

10.     Defendant Virginia Urology Center, P.C. is a corporation organized and existing under the laws of the Commonwealth of Virginia.  Defendant participated in a scheme to defraud the United States and, under its joint funding provisions, the Commonwealth of Virginia.

11.     Defendant in this action knowingly presented, or caused to be presented, false submissions to the Health Care Finance Administration for Medicare reimbursement in violation

3

of 31 U.S.C. § 3729(a)(1) and (2), and created and used, or caused to be created and used, false statements and records in order to ensure payment of the fraudulent Medicare claims in violation of 31 U.S.C. § 3729(a)(2).

## IV.
## RELATOR

12.     Relator-Plaintiff Maria A. Martinez, M.D. is a citizen of the United States. Dr. Martinez was employed by Defendant for approximately four (4) years as an anesthesiologist, first at Defendant's facility located at 7001 Jahnke Road, Richmond, Virginia, and then at its 9105 Stony Point Drive, Richmond, Virginia facility.

13.     As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Dr. Martinez shall provide to the Attorney General of the United States and to the United States Attorney for the Eastern District of Virginia a statement of material evidence and information related to the allegations set forth herein.

14.     As required under the Virginia Fraud Against Taxpayers Act, Virginia Code § 8.01-216.1 *et seq.*, Dr. Martinez shall provide to the Attorney General of the Commonwealth of Virginia a statement of material evidence and information related to the allegations set forth herein.

## V.
## FACTUAL ALLEGATIONS

### RELATOR-PLAINTIFF'S EMPLOYMENT AT VIRGINIA UROLOGY

15.     Dr. Martinez began her Virginia Urology employment on or about August 4, 2003 under a written contract of employment. She served as the Head of the Virginia Urology Department of Anesthesiology.

4

16.     During her employment with Virginia Urology, Dr. Martinez was a dedicated employee with an excellent performance history.  Prior to her unjustified termination, she held an excellent reputation for professional and conscientious practice.

17.     Dr. Martinez has an extensive and accomplished career as an anesthesiologist. She received her medical training at Harvard University and practiced in several clinical settings prior to her Virginia Urology employment.

18.     While employed with Virginia Urology, Dr. Martinez raised numerous issues concerning patient care and billing practices incident to compliance with federal regulations mandated through Virginia Urology's participation in the Medicare reimbursement program.

### REGULATIONS GOVERNING VIRGINIA UROLOGY'S MEDICARE REIMBURSEMENT FOR ANESTHESIA SERVICES

19.     Virginia Urology is an Ambulatory Surgery Center (ASC) facility subject to federal regulation for Medicare reimbursement.  The practice entered into contracts with the United States Health Care Finance Administration (HCFA) and Commonwealth of Virginia regarding reimbursement for medical procedures under the Medicare and Medicaid programs for outpatient urology surgical services and related anesthesia services.

20.     Reimbursement for surgical and anesthesia services under the Medicare Program are governed by the regulations implementing Sections 1832(a)(2)(F)(i) and 1833(a)(i) of the Social Security Act, 42 U.S.C. §§ 1302 and 1395hh [56 Fed. Reg. 8843 (March 1, 1991), 56 Fed. Reg 23.,022 (May 20 1991),as amended at 71 Fed. Reg. 68,226 (November 24, 2006)].

21.     The regulations establish specific criteria for Medicare reimbursement of anesthesia services in 42 C.F.R. §§ 414.46, 415.102, 415.110 and 416.42.  The degree to which the anesthesiologist "personally performs" or "medically directs" others dictates the appropriate level of Medicare reimbursement.

22.     Section 415.110 created "Seven Steps" which required that an anesthesiologist seeking reimbursement for "medically directed" anesthesia services:

(a) (1) (i) Performs a pre-anesthetic examination and evaluation;

(ii) Prescribes the anesthesia plan;

(iii) Personally participates in the most demanding procedures in the anesthesia plan, including induction and emergence;

(iv) Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual...;

(v) Monitors the course of anesthesia administration at frequent intervals;

(vi) Remains physically present and available for immediate diagnosis and treatment of emergencies; and

(vii) Provides indicated post-anesthesia care.

See 42 C.F.R. § 415.110(a)(1)(i)-(vii) [63 Fed. Reg. 58,912 (November 2, 1998)].

23.     Satisfaction of the "Seven Steps" and accurate recording of same are conditions for Medicare reimbursement. See id. at § 415.110(a), (b).  The regulations require that the physician alone inclusively document in the patient's medical record that the conditions for payment set forth in Section 415.110(a)(i)-(vii) (the "Seven Steps") have been satisfied, specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable.  See Section 415.110(b) (1998).

6

24.     Reimbursement for "medical direction" of anesthesia services requires that prior to discharge the anesthesiologist evaluate each patient for proper anesthesia recovery. *See id.* at §§ 416.42(a); 415.110(a).

25.     The regulations require active involvement of the anesthesiologist in patient care. Medicare reimbursement is allowed only when the required anesthesia services are performed personally by the anesthesiologist. Charge reimbursement for procedures satisfying the "Seven Steps" is determined by reference to the Medicare Fee Schedule. *See* 42 C.F.R. § 414.22, 415.46(d) (1991-2003).

RELATOR'S OPPOSITION TO VIRGINIA UROLOGY'S FAILURE TO FOLLOW MEDICARE "MEDICAL DIRECTION" REIMBURSEMENT REGULATIONS FOR ANESTHESIA SERVICES

26.     While employed with Virginia Urology, Dr. Martinez raised questions regarding the practices she observed involving patient safety and fraudulent billing issues, which included one of the practice's anesthesiologists, Dr. David Palombo's ("Dr. Palombo"), repeated failures to perform pre-surgical examinations and evaluations.

27.     Where examinations were performed, they were often incomplete and failed to comply with regulations.   Dr. Martinez observed and opposed the practice of this anesthesiologist, noting in patient records physical examination findings such as "lungs clear to auscultation" and "heart sounds regular in rate and rhythm without any murmurs" when physical examinations were not performed.

28.     This anesthesiologist often did not even go into the operating room the entire time the patient was undergoing surgery and would not see the patient post-operatively in the recovery room. Dr. Martinez felt that if the anesthesiologist was reviewing charts for future scheduled patients, the responsibility of anesthesia direction of the patient under anesthesia was neglected.

29.     Dr. Martinez objected to Dr. Palombo's and Dr. Margaret Montgomery's ("Dr. Montgomery") signing orders discharging patients from the recovery room without having seen the patient post-surgery. Because patients were not evaluated in the Post-Anesthesia Care Unit ("PACU") and were discharged without the medically directing anesthesiologist following up with patients in the recovery room, the discharge papers were completed without the required patient evaluation. They were often written after the patient had left the facility. At times, Dr. Montgomery signed discharge orders in advance, with an estimated time that the patient should be ready for discharge. These estimated times often were so inaccurate that the patient had already left the facility by the time earlier estimated by the anesthesiologist on the discharge order.

30.     Surgical nurses also raised similar concerns to Dr. Martinez.

31.     Dr. Martinez opposed Virginia Urology's practice of billing for the anesthesiologist's "medical direction" of a nurse anesthetist when the "Seven Steps" required for such billing were not performed.

32.     Dr. Martinez raised the anesthesia issues directly with Dr. David Palombo, with Dr. Montgomery, with other physicians in the practice, and with the Directors for Clinical and Surgical Practice, as well as with the practice's administrator, Terry W. Coffey ("Mr. Coffey").

33.     Dr. Martinez met with Mr. Coffey regarding the irregularities in patient care in light of the practice's efforts to increase procedures, to increase billings to patients and to increase Medicare/Medicaid reimbursement. The practices that Dr. Martinez opposed and raised with Mr. Coffey included:

- the failure of physicians to perform pre-anesthesia examinations and evaluations;

• the failure of anesthesiologists to perform PACU admission and discharge examinations and evaluations;

• the failure to provide accurate information on medical charts regarding such pre-operative and post-operative examinations and evaluations;

• the billing of services as "medically directed" when, in fact, they were not;

• proceeding with surgery when there was no post-operative care plan in place, as required by policy;

• the failure of surgeons to attend patients during lithotripsy procedures; and

• the accepted practice of surgeons leaving the lithotripsy room during the surgical procedure to participate in concurrent surgical cases in different operating rooms.

34.     Dr. Martinez's efforts to increase standards and comply with billing regulations were met with resistance. The Virginia Urology management and her physician co-workers were more interested in decreasing overhead and increasing the numbers of daily surgeries and clinic times. Defendant continued to press its physicians, Dr. Martinez, and other anesthesiology employees to increase the daily numbers of patients and surgeries. Defendant knowingly allowed practices which did not meet Medicare's conditions for payment to continue.

### DOCUMENTATION OF VIRGIINIA UROLOGY'S FAILURE TO COMPLY WITH REGULATIONS AND FALSE CLAIMS

35.     Virginia Urology used pre-printed forms which included the "pre-anesthesia evaluation" and "anesthesia record," both parts of the medical chart. These were to be completed and signed by the anesthesiologist. The anesthesia record includes areas for attestation to the physician's presence for "induction of general anesthesia," "initiation of monitoring/sedation," and "initiation of regional anesthesia;" for "emergence/end of case care" and attesting that "I have been present for critical portions and have been immediately available

throughout." Dr. Martinez objected that these services (1) had not been performed; (2) were often not certified on the record; and/or (3) where certified, were often false.

36.     Virginia Urology followed a billing process in which an "anesthesia billing form" was completed by the nurse anesthetist and forwarded to the billing office. The form includes boxes to be checked, where appropriate, for:

☐ MD Personally performing

☐ Medically Directed
   Circle 1 2 3 4 CRNAs

☐ Medically Supervised

☐ CRNA only

37.     Uniformly, and irrespective of whether the anesthesiologist had actually medically directed the anesthesia services, the services were noted by the anesthesiologist and nurse anesthetist on the billing form as "medically directed." The number of cases performed at the same time were left blank on the billing form and forwarded to the billing office, which later inserted the number of cases directed by the anesthesiologist.

38.     Under the regulations, in order to use the procedure coding for "medically directed" anesthesia service when submitting Medicare reimbursement, the anesthesiologist must have been present, completed the "Seven Steps," and provided a truthful certification as to their completion.

39.     Virginia Urology knowingly engaged in the practice of falsely submitting, on a regular basis, Medicare reimbursement for "medically directed" anesthesia services that blatantly failed to comply with the "Seven Steps" for reimbursement of such services at that level.

40.     In or about March, 2005, Dr. Martinez showed Mr. Coffey a patient record which clearly showed that Virginia Urology anesthesiologist Dr. Palombo had not performed the pre-

and post-operative examinations and evaluations for the "medically directed" charges that were billed to Medicare and Medicaid for reimbursement. The particular record Dr. Martinez brought to Mr. Coffey's attention involved a cystoscopy and contigen injection procedure under general anesthesia which began at 10:20 a.m. on February 28, 2005. The boxes for the anesthesiologist's presence at induction and emergence were blank. The box for performance of pre-anesthesia evaluation was blank. The bill had been submitted to Medicare though no certification had been made.

41.      Dr. Martinez was aware that the billing sheet forwarded to the billing office was marked as a "medical direction" for the anesthesia of this patient. She described this to Mr. Coffey as only one example of Dr. Palombo's regular regulatory non-compliance and the impropriety of billing for Medicare reimbursement for the practice of billing for "medical direction" when the facts did not support that level of billing. Mr. Coffey refused to address the issue to require that the practice complied with the applicable regulations for "medical direction" level of Medicare reimbursement.

42.      On information and belief, Virginia Urology submitted the billing units for this patient's "medically directed" anesthesia services to the Health Care Financing Administration (HCFA) for Medicare reimbursement, consistent with its practice of billing Medicare for reimbursement at this level when services did not qualify for reimbursement at this level. The physician code Virginia Urology submitted for Medicare/Medicaid reimbursement falsely represented the services provided.

43.      At the same time, Dr. Martinez showed Mr. Coffey a chart of a patient scheduled for surgery on January 31, 2005 whose pre-anesthesia chart evaluation had been performed by Dr. Palombo. When the lab results showed the patient had a critically abnormal blood count, Dr.

Palombo had refused to reschedule the procedure and had not informed the surgeon of this critically abnormal pre-operative laboratory result. He indicated to Dr. Martinez that if the patients were scheduled for a procedure he would not alter the schedule. The purpose of the examination and evaluation was for suitability for safe administration of anesthesia, not to simply "go through the motions" to proceed with each surgery scheduled so as to increase revenues. Dr. Martinez intervened, the surgery was cancelled, and the patient was referred to the specialist appropriate for the issue. Dr. Martinez explained the patient safety issues, which were presented by Dr. Palombo's failures to perform thorough or meaningful pre-operative examinations and, if necessary, to delay or reschedule surgeries. Mr. Coffey refused to address the patient safety issues or to require that the practice comply with the applicable regulations for Medicare/Medicaid reimbursement.

44.    Throughout Dr. Martinez's employment Virginia Urology submitted false claims to Social Security for Medicare reimbursement when the practice had not complied with the "Seven Steps" required for Medicare reimbursement. Specifically, Virginia Urology sought reimbursement for "perform[ing] a pre-anesthetic examination and evaluation" when they had not been performed; for "personally participating in the most demanding procedures in the anesthesia plan, including induction and emergence" when clearly the anesthesiologist was not available for personal medical direction; and for "monitor[ing] the course of anesthesia administration at frequent intervals" when such monitoring had not occurred. Moreover, Virginia Urology submitted reimbursement claims that lacked the certification or truthful certification of the anesthesiologist. Mr. Coffey could have easily confirmed this with review of records, personal observation or interviews of surgical nurses and CRNAs.

45.     On information and belief, during Plaintiff's employment, and thereafter, Virginia Urology continued to submit false claims for Medicare reimbursement when the practice had not complied with the "Seven Steps" required for Medicare reimbursement of anesthesia services.

46.     Additionally, Virginia Urology encouraged and/or permitted the falsification of patient records and billing records to reflect the performance of the "Seven Steps" for Medicare reimbursement when they had not, in fact, been fully performed.

### VIRGINIA UROLOGY'S FALSE BILLING FOR SURGEONS ATTENDING AND DIRECTING LITHOTRIPSY PROCEDURES

47.     Dr. Martinez also raised concerns with Kelly Wilson, R.N., Operating Room Director, and Traci Badin, R.N., Director of Surgical Services, regarding physicians' absence from the surgical suite during lithotripsy surgeries.  Dr. Martinez complained that surgeons supposedly attending a patient in the lithotripsy room were called to scrub into another case to assist another surgeon – in effect having two surgeries ongoing at the same time.  Dr. Martinez complained about these surgeons not attending lithotripsy procedures but billing for the procedures as if they had attended the patient during surgery.

48.     Dr. Martinez noted to them that most of the surgeons regularly left the surgical suite during the procedures, went to their offices in another part of the building, stayed in the break room for breakfast or lunch, met with drug representatives, or attended clinic patients rather than attending patients in surgery.  However, she noted that while many surgeons did this, Dr. David Glazier regularly left the lithotripsy room during surgery.  Dr. Martinez also brought this to Mr. Coffey's attention, but Virginia Urology took no action to require this surgeon's attendance during the surgical procedure.

49.     On information and belief, Virginia Urology was not independently approved for lithotripsy procedures and did not bill Medicare directly for lithotripsy procedures, but instead billed this procedure through St. Mary's Hospital, which submitted the Medicare reimbursement claim to Medicare.

50.     The lithotripsy procedure is a surgical procedure for which Medicare is billed under a CPT (Current Procedure Terminology) code.  On information and belief, Virginia Urology billed for the surgeon's "medical direction" of lithotripsy procedures when the physician was not physically present during the procedure and not immediately available to furnish assistance and direction throughout the performance of the procedure.

51.     Relator-Plaintiff raised this internally as both a patient safety concern and as a Medicare/Medicaid false billing issue.  Mr. Coffey refused to address the issue or to correct or reverse Medicare/Medicaid billings.

52.     Regulations and the Accreditation Association for Ambulatory Healthcare (AAAHC) guidelines require that, for outpatient hospital services, surgical services be provided under the "direct supervision" of the physician, the regulations further requiring the physician to be immediately available to furnish assistance and direction throughout the performance of the procedure. *See* 42 C.F.R. § 410.27.

### VIRGINIA UROLOGY'S EMPHASIS ON REVENUES OVERRIDES ITS OBLIGATION TO COMPLY WITH MEDICARE REIMBURSEMENT REGULATIONS

53.     Increasingly, Dr. Martinez heard her peer physicians at Virginia Urology express the sentiment that anesthesia services were a "non-revenue source" and a "drain."  Although the applicable regulations required the attendance of the anesthesiologist during procedures, Dr. Kramolowsky stated that he was "not paying an anesthesiologist to be sitting on their ass."

During this time, the practice lengthened clinic times and increased the numbers of daily patients.

54. Dr. Palombo told her that she was "stupid" and "making a bigger deal of anesthesia than necessary – even a monkey can do anesthesia."

55. In an effort to address Virginia Urology management's concern with "profitable" anesthesia practice, Dr. Martinez approached Dr. Kramolowsky with a proposal to handle anesthesia services as a non-employee contractor. Dr. Kramolowsky was encouraging to the proposal and suggested several changes. Dr. Martinez then presented the proposal to the practice's administrator Terry Coffey in early June, 2007. Such proposal was rejected by Virginia Urology. Mr. Coffey was visibly angered by Dr. Martinez's proposal, stating, "Why did you do this, anyway?"

56. Shortly thereafter, as Dr. Martinez returned from a previously planned vacation, Mr. Coffey informed Dr. Martinez that she was being placed on two (2) weeks paid leave to "think about" resigning. Mr. Coffey told her that if she did not resign her contract would be terminated "for cause."

### VIRGINIA UROLOGY TERMINATES DR. MARTINEZ'S EMPLOYMENT

57. On July 16, 2007 Dr. Martinez was provided a Severance Agreement and release of claims stating that Virginia Urology "intends to terminate the employment of [Dr. Martinez] pursuant to paragraph 6(c) of the Employment Agreement," and was escorted out of the practice's medical facility.

58. Paragraph 6(c) of the Employment Agreement allows termination for failure to perform her professional duties, improper or unethical conduct, felony conviction, or loss of medical license or privileges, on a vote of 70% of the Virginia Urology practice's shareholders.

59.     No valid cause existed for termination of Relator's employment.

60.     Despite repeated requests, Virginia Urology has failed to provide any factual support for the allegation that "cause" existed for her termination. Dr. Martinez refused to sign the proffered release of claims.

### POST-TERMINATION EFFORTS BY VIRGINIA UROLOGY TO RETALIATE AGAINST RELATOR

61.     Since the time of her termination, and in retaliation for her opposition to the practices she encountered at Virginia Urology, Virginia Urology has attempted to interfere with Dr. Martinez's ability to practice medicine and otherwise damaged her reputation.

62.     Under Dr. Martinez's Employment Agreement, Virginia Urology was obligated to provide "tail" insurance coverage. Paragraph 5(b) provides, "The Corporation shall provide 'tail coverage' with a professional liability carrier for acts during the period under employment with the Employee if employment is terminated by either party."

63.     As a practical matter, it was virtually impossible for Dr. Martinez to obtain subsequent full-time employment in private practice until she obtained such "tail" insurance coverage.

64.     Dr. Martinez contacted Virginia Urology after her termination regarding the provision of "tail" insurance coverage. Virginia Urology's Director of Human Resources, Deb Geppert, told her that Virginia Urology would absolutely not provide the coverage. Dr. Martinez contacted the insurance agent, who also told her that Virginia Urology would not provide the "tail" insurance coverage. Dr. Martinez confirmed that, in October, 2007, she had no "tail" insurance coverage.

65.     Virginia Urology delayed the provision of a certificate of "tail" insurance coverage for almost one year. Finally, on or about July 11, 2008, and only after Dr. Martinez

obtained the assistance of counsel, Virginia Urology provided the "tail" insurance endorsement, dated "effective September, 1, 2007."

66.    On information and belief, Virginia Urology either caused the "tail" endorsement to reflect a backdated September 1, 2007 date or had delayed providing the endorsement so as to prevent or delay Dr. Martinez obtaining substitute employment.

67.    Although Dr. Martinez finally obtained substitute employment in her profession after her July 16, 2007 termination, she was unable to actively practice medicine in a private practice setting until she obtained the "tail" coverage. Dr. Martinez performed some "locum tenens," or substitute coverage, and eventually secured employment with the federal government. Dr. Martinez has suffered economic damages and has been damaged professionally and in her reputation. Additionally, she has suffered emotional damages resulting from Defendant's actions.

<u>COUNT ONE</u>
**Fraudulent Claims in Violation of 31 U.S.C. § 3729, *et seq.***
**(False Claims Act)**

68.    Relator-Plaintiff incorporates and relies upon the allegations stated in paragraphs 1- 67 of the Complaint as if the same allegations were fully restated in Count One.

69.    Defendant engaged in a pattern and practice of defrauding the government by submitting claims for reimbursement for anesthesia and lithotripsy services without having satisfied the conditions for Medicare reimbursement at the reimbursement level submitted.

70.    The submissions referenced in paragraphs 26-46 and 47-52, above, constituted false claims under the Act, and specifically 31 U.S.C. § 3729.

71.     Virginia Urology made these claims seeking to obtain financial benefit by obtaining reimbursement under Medicare reimbursement for levels of anesthesia and lithotripsy services not rendered or allowed by the controlling statute and regulations.

72.     Based on an estimated seven (7) Medicare/Medicaid cases per day, five (5) days per week, twenty three weeks spent at the Stony Point Surgery Center, during a single year, each anesthesiologist performs approximately eight hundred (800) Medicare/Medicaid cases per year. Virginia Urology owes the Medicare Program a total exceeding $500,000.00 in overpayments, penalties and interest.

73.     The Medicare program is entitled to full recovery of all amounts paid by the Medicare Program and any other federally funded or state funded programs as a result of the submission of claims for medically directed anesthesia and lithotripsy services which did not comply with the controlling "Seven Steps" and "medical direction" regulations, as referenced in paragraphs 19-52, or which Defendant caused to be submitted to the Medicare Program.

## COUNT TWO
### Fraudulent Claims in Violation of Code of Virginia §8.01-216.1, *et seq.*
### (Virginia Fraud Against Taxpayers Act)

74.     Plaintiff incorporates and relies upon the allegations stated in paragraphs 1- 73 of the Complaint as if the same allegations were fully restated in Count Two.

75.     The submissions referenced in paragraphs 26-46 and 47-52, above, constituted false claims under the Virginia Fraud Against Taxpayers Act, and specifically Va. Code § 8.01-216.3.

76.     The Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.3, defines one making a "false claim" as any person who (a) knowingly presents, or causing to be presented, a false or fraudulent claim for payment or approval; (b) knowingly makes, uses or causes to be

made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth; and (c) conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

77.     Defendant engaged in a pattern and practice of defrauding the Commonwealth by knowingly submitting claims for reimbursement for anesthesia and lithotripsy services without having satisfied the conditions for Medicare/Medicaid reimbursement at the reimbursement level submitted. Defendant's management was made aware of the practices, continued the practices and terminated Dr. Martinez in retaliation for her opposition.

78.     Virginia Urology made these claims seeking to obtain financial benefit by obtaining reimbursement under Medicare and Medicaid reimbursement for levels of anesthesia services not rendered or allowed by the controlling statute and regulations.

79.     Virginia Urology owes the Medicare Program a total exceeding $500,000.

80.     The Medicare program is entitled to full recovery of all amounts paid by the Medicare Program and any other federally funded or state funded programs as a result of the submission of claims for medically directed anesthesia and lithotripsy services which did not comply with the controlling "Seven Steps" and "medical direction" regulations, as referenced in paragraphs 19-52, and/or which Defendant caused to be submitted to the Medicare/Medicaid Programs.

## COUNT THREE
### Retaliation in Violation of 31 U.S.C. § 3730(h) and Va. Code § 8.01-216.8
### (False Claims Act and Virginia Fraud Against Taxpayers Act)

81.     Relator-Plaintiff incorporates and relies upon the allegations stated in paragraphs 1- 80 of the Complaint as if the same allegations were fully restated in Count Three.

82.     Virginia Urology retaliated against Dr. Martinez for opposing practices made unlawful by 31 U.S.C. § 3729 and/or Va. Code § 8.01-216.3 internally reporting fraud committed against the government by Virginia Urology employees.

83.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer, great humiliation, severe mental anguish, distress, injury and damages, damage to her reputation, loss of employment opportunities, loss of earning capacity, embarrassment, inconvenience, litigation expense including attorneys' fees, consequential damages including loss of career development opportunities and other injury.

## COUNT FOUR
### Wrongful Termination in Violation of Public Policy
### (Va. Code § 8.01-216.1, *et seq.*, the Virginia Fraud Against Taxpayers Act, and
### Va. Code § 54.1-2909, Reporting Requirement for Physicians)

84.     Relator-Plaintiff incorporates and relies upon the allegations stated in paragraphs 1- 83 of the Complaint as if the same allegations were fully restated in Count Four.

85.     Dr. Martinez is a member of the class of persons the Virginia General Assembly intended to protect in the enactment of statutes which forbid the fraudulent billing of Medicare reimbursement for medical services and requiring reporting conduct that is likely to cause injury to patients.

86.     Virginia public policy underlying the Virginia statutes forbidding false or fraudulent billing for services, including seeking Medicare and Medicaid reimbursement such as Va. Code § 8.01-216.1, the Virginia Fraud Against Taxpayers Act, protect against termination of employment for an employee's opposition to illegal conduct; for refusing to violate Virginia law; and/or for refusal to participate in or conceal statutory violations, including such policies as those which forbid the fraudulent billing of governmental bodies for services. Virginia public policy underlying the Virginia fraudulent billing statutes additionally protects against termination of

20

employment for an employee's honoring her statutory right and obligation to oppose and to report such conduct.

87.     Virginia public policy underlying the Virginia statutes requiring that physicians licensed in Virginia report patient safety concerns, including "any evidence that indicates a reasonable probability that a person licensed under this chapter... has engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient or patients; (or) has engaged in unprofessional conduct...", protects against termination of employment for an employee's opposition to illegal conduct and reporting patient safety issues. *See* Va. Code § 54.1-2909 "Further Reporting Requirements..."

88.     Defendant Virginia Urology terminated Dr. Martinez's employment in violation of Virginia public policies underlying Va. Code § 8.01-216.1, the Virginia Fraud Against Taxpayers Act, and Va. Code § 54.1-2909, "Further Reporting Requirements (by Person Licensed to Practice Medicine in Virginia)," and these policies prohibit termination for opposing fraudulent Medicare/Medicaid billing practices and/or patient safety issues.

89.     All of the Defendant's actions alleged herein were intentional, malicious, willful, wanton, and reckless, entitling Dr. Martinez to an award of punitive damages.

90.     As a direct and proximate cause of Defendant' combined actions, Dr. Martinez has suffered, continue to suffer, and will in the future suffer injury and damages, including embarrassment, inconvenience, humiliation, loss of enjoyment of life, severe mental anguish, pain, suffering, litigation expense, consequential damages and other injury.

## COUNT FIVE
### Breach of Contract

91.     Plaintiff incorporates and relies upon the allegations stated in paragraphs 1- 90 of the Complaint as if the same allegations were fully restated in Count Five.

92.     Paragraph 6(c) of Plaintiff's Employment Agreement states that Dr. Martinez's employment could be terminated on a vote of 70% of the shareholders of Virginia Urology Center, P.C. "in the event (i) the Employee is unable, fails or refuses to perform the Employee's obligations as an Employee, or to properly perform the Employee's duties as a medical practitioner in the Employee's speciality; (ii) in the event the Employee engages in improper, unethical or other conduct which the Corporation believes to be detrimental to the Corporation; (iii) in the event the Employee is convicted of a felony; (iv) in the event the Employee loses his or her license to practice medicine; or (v) in the even the Employee's admission, practice privileges, membership or right to do business with any hospital, insurer, independent physicians association, preferred provider or indemnifier with whom the Corporation does business is not granted, or if granted is subsequently suspended or revoked, this Agreement shall terminate automatically on the date of such refusal to grant, suspension, or revocation unless expressly waived in writing by the Corporation."

93.     Although no condition for such "cause" termination existed, Virginia Urology terminated Plaintiff's employment in willful and material breach of the Employment Agreement.

94.     Paragraph 5(b) of Plaintiff's Employment Agreement states that "(t)he Corporation shall provide "tail coverage" with a professional liability insurance carrier for acts during the period under employment with the Employee if employment is terminated by either party."

95.     Despite repeated demand, Virginia Urology delayed, failed and refused to provide such insurance endorsement from July 16, 2007 until July 11, 2008, in willful and material breach of the Employment Agreement.

96. As a direct and proximate result of each such breach, Dr. Martinez has suffered direct, incidental and consequential damages.

WHEREFORE, Dr. Martinez, on behalf of herself, the United States and the Commonwealth of Virginia requests the following relief:

(a) judgment against Defendant in the amount of three (3) times the amount of damages the United States of America and/or Commonwealth of Virginia have sustained because of Defendant's actions, plus a civil penalty of $11,000.00 for each action in violation of 31 U.S.C. § 3729 and/or Va. Code § 8.01-216.3, and costs of this action with interest for Counts One and Two;

(b) in the event that the United States and/or Commonwealth of Virginia proceeds with this action, Dr. Martinez be awarded twenty-five percent (25%) of the proceeds of the action or settlement of a claim for Counts One and Two;

(c) judgment against Defendant in the amount of two (2) times the amount of back pay and benefits with interest at the applicable pre- and post-judgment statutory rates, reinstatement or front pay in lieu thereof, and/or the present economic value of the expected income and benefits Relator-Plaintiff would have earned had her employment continued without Defendant's illegal interference, and compensation for special damages for Count Three;

(d) judgment against Defendant for compensatory and punitive damages for Counts Four;

(e) judgment against Defendant Virginia Urology for contractual damages for Count Five;

(f) such appropriate equitable injunctive relief against Defendant for statutory violations as allowed by 31 U.S.C. § 3730(h) and/or Code of Virginia §8.01-216.1, *et seq.*

including the enjoining and permanent restraining of these violations and direction to Defendant to take such affirmative action as is necessary to ensure that the affects of the unlawful employment practices are eliminated and do not continue to affect Relator-Plaintiff's future employment opportunities;

(g)    judgment for incidental and consequential damages, including sums to offset the tax consequences of receiving damages and/or back pay and benefits in lump sum and/or associated with awards of attorneys' fees or other monetary relief;

(h)    an award for all costs incurred, including reasonable attorneys' fees and expert witness fees for Counts One, Two and Three; and in addition

(i)    such other and further relief as may be appropriate under the circumstances.

MARIA A. MARTINEZ, M.D.

By:_____
                          Counsel

Harris D. Butler, III (VSB No. 26483)
Rebecca H. Royals (VSB No. 71420)
BUTLER WILLIAMS & SKILLING, P.C.
100 Shockoe Slip, Fourth Floor
Richmond, Virginia 23219
(804) 648-4848 (telephone)
(804) 648-6814 (facsimile)
Email: hbutler@butlerwilliams.com
        rroyals@butlerwilliams.com